O

JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| KATHLEEN MULLIGAN, | ) | Case No. CV 15-712 |
| | ) | |
| Plaintiff, | ) | **ORDER GRANTING MOTION FOR** |
| | ) | **SUMMARY JUDGMENT** |
| v. | ) | |
| | ) | [Dkt. 41] |
| JENNY YANG, | ) | |
| | ) | |
| Defendants. | ) | |

Presently before the court is Defendant Jenny Yang, Chairperson of the United States Equal Employment Opportunity Commission's ("EEOC"), Motion for Summary Judgment, or in the Alternative, for Summary Adjudication of Issues. (Dkt. 41.) After considering the parties' submissions and hearing oral argument, the court adopts the following Order.

**I. BACKGROUND**

Plaintiff Kathleen Mulligan has been an employee at the EEOC for over twenty years. (Compl. ¶ 7.) Prior to her current position, Mulligan served as a GS-14 Trial Attorney for the EEOC in the San Diego Area Office. (*Id.* ¶ 21.) In 1999, Mulligan filed a

complaint for sex discrimination and unlawful retaliation under Title VII before the EEOC in connection with her employment at the EEOC. *Mulligan v. Dominguez*, EEOC Appeal No. 01A21675, 2003 WL 21485280, at *1 (June 19, 2003). The agency concluded there was no discrimination and the case was dismissed. *Id.* at *17. Following this action, Mulligan was transferred to the Los Angeles Office Legal Unit. (Compl. ¶ 21.) Since 2000, Mulligan has served as a GS-14 Attorney-Examiner (Administrative Judge) in the Los Angeles District Office. (*Id.* ¶ 6; Ex. 1 attached to Declaration of David Pinchas ("Mulligan Depo") 87:5-6.) In her current role, Mulligan is responsible for adjudicating discrimination complaints brought by federal agency employees who work in the geographic area covered by the L.A. District Office. (Compl. ¶ 6.)

### A. Efforts to Acquire Accommodations

Around 2003, Mulligan began experiencing arm and hand pain. (Mulligan Depo. 87:8-9.) By 2005, Mulligan was diagnosed with rheumatoid arthritis, a chronic autoimmune condition, which causes joint swelling, fatigue, and other pain. (Compl. ¶ 29.) As a result of her condition, Mulligan alleges that she suffers substantial restrictions on her ability to walk, lift, carry, push, pull, type, and file. (*Id.* ¶ 7.) At some point between 2003 and 2005, Mulligan began requesting accommodations from the EEOC for her physical disabilities.[1] In May 2005, the EEOC conducted an ergonomic assessment of Mulligan's workstation. As a result of the assessment, Mulligan was provided with various computer accessories including an ergonomic keyboard and mouse, a phone headset, document holder, and a text-to-speech dictation software. (*See id.* ¶50; Mulligan Depo. 107:5-7, 109:23.) Mulligan alleges, however, the EEOC ignored a number of other accommodations suggested by the ergonomic assessment report without explanation, including recommendations concerning office furniture, clerical support, and schedule

---

[1] In her Complaint, Mulligan alleges that she first requested reasonable accommodation in 2005. (Compl. ¶ 4.) However, during her deposition, Mulligan testified that she "started to ask for some consideration from the EEOC maybe in 2004." (Mulligan Depo. 88:4-6.) In her Opposition to the instant motion, Mulligan states that the "EEOC began processing her Request [for ergonomically appropriate furniture] and accepted her medical information furnished in September 2003. (Opp'n 1.)

adjustments. (Compl. ¶ 50.) At various points, after the assessment, Mulligan did receive some new accommodations. (*Id*. ¶ 52.) For instance, in 2007, Mulligan received new filing cabinets. (Mulligan Depo. at 249:20-25.) And in 2009, a few months after making a request, Mulligan received an "ergonomically appropriate" chair. (*Id*. at 149:17-21.)

In November 2012, Plaintiff renewed her request for an ergonomic evaluation of her workstation. (*See* Ex. 3, attached to Pinchas Decl.) One month later, the EEOC provided a second assessment to determine whether adjustments were needed. (Mulligan Depo. 278:10-18.) In February 2013, Mulligan sent a request to the EEOC's disability program manager, Dr. Donna Walton, for new furniture. (*See* Ex. 4, attached to Pinchas Decl.) In May 2013, the District Resources Manager for the L.A. District Office met with Mulligan regarding her furniture request. (Declaration of Thomas Profit ¶ 7.) After trying out some suggested furniture in a separate office, Mulligan approved the changes in July 2013. (Profit Decl. ¶ 8.) Payment for the furniture was authorized in September 2013 and the pieces were delivered in November. (Profit Decl. ¶¶ 10-11.)

**B. Relationship with Supervisor**

While Mulligan was attempting to secure workplace accommodations, she alleges that her relationship with her first-line supervisor deteriorated. From 2000, when Mulligan began serving as an Administrative Judge, until March 2013, Christine Siegel served as the Supervisory Administrative Judge who oversaw Mulligan's work. (Compl. ¶ 24.) According to Mulligan, Siegel was predisposed against Mulligan because, as her supervisor, she knew about the previous Title VII complaint Mulligan filed while working in the San Diego Office. (*See* Compl. ¶¶ 36-37.) In 2004, Mulligan also notes that she informed Siegel of her arm and hand pain and, in 2005, she told Siegel about her rheumatoid arthritis diagnosis. (*Id*. ¶ 28.)

As early as 2006, Siegel allegedly began making negative remarks towards Mulligan. (*Id*. ¶ 38.) On that occasion, Siegel had entered Mulligan's office and was told "Just let me finish this sentence so I don't lost my train of thought." (Mulligan Depo. 239:22-240:4.) Siegel responded by yelling at Mulligan, "Why don't you see if you can get

another unit to take you." (*Id.*; Compl. ¶ 38.) On another occasion, Siegel allegedly referred to Mulligan as "a pig defense lawyer," in reference to Mulligan's prior employment at a law firm. (Compl. ¶ 39.) A third incident arose in 2010 when Mulligan reported to the Deputy Director that a clerk in the Hearing Unit was concerned about racism while Siegel was out of the office. (*Id.* ¶ 41.) Neither party states that Siegel was the cause of the concern. When Siegel returned, she allegedly told Mulligan, "You are never to talk to another manager about any kind of discrimination or harassment in this Unit. Do you understand?" (*Id.*)

Several other incidents reported by Mulligan appear to be directly related to her efforts to seek accommodations. In 2005, when Mulligan first informed Siegel of her diagnosis and asked for an accommodation, Siegel allegedly responded "other judges don't get that." (*Id.* ¶ 47.) On one specific occasion, Mulligan was informed that she could not receive a travel accommodation—an upgrade from economy to business class on a work flight to Asia—because "we don't do that." (*Id.*) Around this time, Mulligan also reports seeking the assistance of a clerk to help transport materials and file documents. Siegel allegedly told Mulligan, however, that the clerk doesn't work for her so she shouldn't ask her for help. (Mulligan Depo. 113:18-22.) Mulligan also notes two instances from 2011. The first involved Siegel "unreasonably" delaying approval of Mulligan's request for a telework assignment while Mulligan was recovering from surgery (*id.* ¶ 66) and the other involved Siegel questioning why Mulligan needed medical leave for a vertebra surgery, which was "just a stress fracture" (*id.* ¶ 66).

According to Mulligan, the situation worsened in 2011 when she alleged that Siegel engaged in an effort to undermine Mulligan in the eyes of a fellow Administrative Judge, Leslie Troope. (*Id.* ¶ 68.) Mulligan alleges that from October 2011 to October 2012, Siegel instructed Troope not to discuss reasonable accommodations with Mulligan. (*Id.*) Siegel also allegedly discussed Mulligan's prior Title VII activity with Troope and made other negative comments about Mulligan. (*Id.* ¶ 71.) The most explicit of these conversations was an incident in 2012 when Siegel referred to Mulligan as an "ungrateful

fucking bitch." (*Id.* ¶ 5.) According to Troope, Siegel had asked Mulligan to speak at an awards ceremony about a complex case and Mulligan had declined. (Ex. 2, attached to Pinchas Decl. ("Troope Depo.") 116:23-117:3.) Siegel then made the offending remark when recounting the interaction to Troope. (*Id.*)

On December 7, 2012, Mulligan initiated the EEOC process. (Compl. ¶ 12.) According to Mulligan, she did not initially want to report a complaint to the EEOC unless her "life depended on it" because she was dissatisfied with the outcome of her previous efforts to seek redress from the EEOC. (Mulligan Depo. 126:1-9.) In 2012, however, Mulligan concluded that she had to file a complaint. As she explained:

> I thought my life, in the sense of my professional life, did depend on it. When I found out that Christine Siegel had clandestinely told Lesley so many lies about me and used obscene language about me, I waited more than 30 days to give her a chance to come in and apologize . . . . And she didn't. She didn't do anything. And then my time was running out. I had to file I had to go to EEO so I didn't blow my time period.

(*Id.* at 132:23-133:9.) The EEOC concluded its formal investigation process on July 23, 2013 and referred the matter for hearing before a "contract administrative judge" hired for the purpose of handling EEO complaints by EEOC employees against the EEOC. (Compl. ¶¶ 6-8.) After 180 days passed without hearing, Mulligan filed suit in federal court.

Mulligan's suit states five causes of action against the EEOC, alleging that the agency: 1) retaliated against Mulligan for engaging in protected Title VII activity; 2) retaliated against Mulligan for engaging in protected activity under the ADA and related statutes; 3) engaged in retaliation per se under Title VII; 4) engaged in retaliation per se under the ADA; 5) violated the duty of reasonable accommodation. (*See generally* Compl. ¶¶ 78-114.) The EEOC now moves for summary judgment.

## II. LEGAL STANDARD

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment

5

as a matter of law." Fed. R. Civ. P. 56(a). A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). All reasonable inferences from the evidence must be drawn in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 242 (1986). If the moving party does not bear the burden of proof at trial, it is entitled to summary judgment if it can demonstrate that "there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 323.

Once the moving party meets its burden, the burden shifts to the nonmoving party opposing the motion, who must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. Summary judgment is warranted if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. A genuine issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. There is no genuine issue of fact "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

It is not the court's task "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1278 (9th Cir. 1996). Counsel has an obligation to lay out their support clearly. *Carmen v. San Francisco Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001). The court "need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposition papers with adequate references so that it could conveniently be found." *Id*.

///

///

1    **III. DISCUSSION**

2       **A.  Timeliness of Claims**

3           As a threshold matter, Defendant contends that a majority of Mulligan's claims are

4    time-barred. Federal employees that seek to bring federal discrimination claims against

5    their employers must exhaust all administrative remedies. *Cherosky v. Henderson*, 330 F.3d

6    1243, 1245 (9th Cir. 2003). Under federal regulations, "[a]ggrieved persons who believe

7    they have been discriminated against on the basis of . . . handicap must consult [an

8    EEOC] Counselor prior to filing a complaint in order to try to informally resolve the

9    matter." 29 C.F.R. § 1614.105(a). This consultation must occur "within 45 days of the date

10   of the matter alleged to be discriminatory or, in the case of personnel action, within 45

11   days of the effective date of the action." *Id*. at § 1614.105(a)(1).  Although failure to

12   comply with this pre-filing exhaustion requirement is not a "jurisdictional prerequisite

13   for suit in federal court," failure to comply with it is nonetheless "fatal to a federal

14   employee's discrimination claim in federal Court." *Kraus v. Presidio Trust Facilities Div./*

15   *Residential Mgmt. Branch,* 572 F.3d 1039, 1043 (9th Cir. 2009).

16          Mulligan's complaint alleges that the EEOC engaged in discriminatory or

17   retaliatory acts against her on a number of occasions dating from November 21, 2003

18   until March 29, 2013. (*See* Dkt. 32.) However, it is undisputed that Plaintiff did not initiate

19   the EEOC process until December 7, 2012. (Compl. ¶ 12.) Accordingly, any acts that took

20   place before October 23, 2012 would be untimely under the 45-day time limit. *See* 29

21   C.F.R. § 1614.105(a). The Complaint alleges only two instances of the EEOC denying or

22   delaying an accommodation after October 23, 2012. The first is that Defendant did not

23   promptly respond to an October 23, 2012 request for new equipment and an ergonomic

24   work assessment. (Dkt. 32-13.) Mulligan acknowledges, however, that she was eventually

25   provided with an ergonomic assessment in December 2012. (Mulligan Depo. 278:10-18.)

26   The second is that Mulligan was denied a request for clerical assistance on March 29,

27   2013. Although, here too, Mulligan acknowledges that she eventually received additional

28   clerical support later in 2013. (*Id.* 110:15-25; 113:24-114:4.) In addition to these denials of

7

1   accommodation, Mulligan also alleges that she first learned of Siegel's profane remarks
2   regarding Mulligan in November 2012.

3          Mulligan contends that the time bar does not apply to her claims because she
4   never received a written notice that her accommodation request had been denied. (Opp'n
5   6.) Instead, Mulligan argues that the back and forth process with the EEOC from 2003
6   until 2012 constituted an ongoing violation of her rights. Mulligan's contention is
7   foreclosed, however, by the Supreme Court's decision in *National R.R. Passenger Corp. v.*
8   *Morgan*. 536 U.S. 101, 113 (2002) (holding that plaintiffs may not bring discrete
9   discrimination claims that have been "time barred, even when they are related to acts
10  alleged in timely filed charges."). In *Morgan*, the Court held that "ongoing violation"
11  theories could not save untimely discrimination claims and, instead, every discrete act of
12  discrimination "starts a new clock for filing charges alleging that act." *Id.* The relevant
13  question for assessing the timeliness of Mulligan's claim is not whether she received a
14  written denial notice but instead whether she knew or reasonably should have known
15  "that the discriminatory matter or personnel action occurred." *See* 29 C.F.R. §
16  1614.105(a)(2); *see also Korsunska v. Johnson*, No. 2:13-CV-07010-CAS, 2014 WL 3942084, at
17  *4 (C.D. Cal. Aug. 11, 2014). By Mulligan's own admission, she believed that there was a
18  "violation of the EEOC policy to engage in the interactive process" as early as 2005. (*See*
19  Mulligan Depo. 116:4-5.) And Mulligan's Complaint states numerous times that she was
20  denied reasonable accommodations prior to October 23, 2012. (*See* Compl.  ¶¶ 43, 47, 62,
21  85.)

22          Mulligan's arguments to the contrary are unavailing. First, Mulligan's contention
23  that only a written notice denying benefits constitutes a violation for purposes of starting
24  the EEOC clock fails to explain why she initiated the redress process in October 2012
25  given that there is no indication she received any denial notice at that time. Mulligan also
26  references the Ninth Circuit's holding in *Pouncil v. Tilton*, 704 F.3d 568 (2012), that "if an
27  employer engages in a series of acts each of which is intentionally discriminatory, then a
28  fresh violation takes place when each act is committed." *Id.* at 580. This statement only

reiterates the rule set forth in *Morgan* and does not affect the timeliness of Mulligan's claim. In *Pouncil*, the court considered an inmate's allegation of constitutional deprivations arising from incidents that took place in 2002 and 2008. *Id.* at 568. Even though both deprivations arose from application of the same prison policy, the court held that the fact the earlier claim was time barred did not mean the latter claim was also untimely. *Id.* at 580. The same is true in this case where Mulligan can bring claims post-dating October 23, 2012, even if she is time barred from bringing earlier claims.

Mulligan also contends that equitable doctrines of tolling and estoppel save her claim. As to tolling, Mulligan explains that her delay in initiating the EEOC process reasonably relied on EEOC decisions "which toll the time limit for bringing an EEO complaint where the Agency has failed to specifically deny the complainant's requests." (Opp'n 7.) However, as noted above, the central question for a tolling purposes claim is whether "the plaintiff knows or has reason to know of the actual injury." *See Lukovsky v. City & Cty. of San Francisco*, 535 F.3d 1044, 1051 (9th Cir. 2008). And here, Plaintiffs own testimony establishes that she knew of the alleged violations and chose not to act earlier because of dissatisfaction with a prior EEOC process. (*See* Mulligan Depo. 126:1-9.) The EEOC decisions Mulligan claims to rely on do appear to suggest that some individuals were permitted to wait until a formal denial notice to initiate a formal EEOC complaint but the opinions do not contain sufficient facts to determine whether the claimants in those cases could not have known about their claim until receiving the notice of denial. *See McGreevy v. U.S. Postal Service*, EEOC Appeal No. 01A43361; *Coddington v. U.S. Postal Service*, EEOC Appeal No. 01A40149. Moreover, those cases involve much shorter delays between the request for accommodation and the formal notice of denial. Mulligan provides no authority for the proposition that she was entitled to wait nearly ten years before concluding that a constructive denial had taken place. As for equitable estoppel, Mulligan contends that the EEOC "engaged in a pattern of false promises," which led Mulligan to believe that her accommodation requests would be granted, and, only in 2012, did Mulligan realize that was not the case. (Opp'n 8-9.) However, as the EEOC

9

correctly notes, a litigant claiming equitable estoppel against the government must provide evidence of "[a]ffirmative misconduct" that goes beyond "[m]ere unexplained delay." *Jaa v. U.S. I.N.S.*, 779 F.2d 569, 572 (9th Cir. 1986). Mulligan has provided no such evidence in this case.

### B. Hostile Work Environment Claim

Although the parties extensively discuss a potential standalone hostile work environment claim, the court notes at the outset that the Complaint does not appear to state a separate cause of action for "hostile work environment." Instead, the phrase only appears twice in the entire Complaint: once in the caption and once when Mulligan alleges that "Defendant repeatedly retaliated against Ms. Mulligan through unlawful harassment because of prior Title VII protected activity, creating a hostile work environment." (Compl. at 1; *id.* ¶ 5.) On both occasions, the reference to a hostile work environment appears to be as a part of the overall retaliation cause of action. Although the court could conclude its analysis of this claim here, it nonetheless considers whether such a claim would survive summary judgment out of an abundance of caution.

One consequence of Mulligan's ambiguous pleading is that it is unclear whether she is alleging a hostile work environment as part of her Title VII claim or as part of her disability discrimination claim. If it is the latter, the court notes that the Ninth Circuit has not yet recognized a hostile work environment claim under the ADA and, instead, has declined to decider whether such a claim exists. *Brown v. City of Tucson*, 336 F.3d 1181, 1190 (9th Cir. 2003). Nonetheless, both district courts in this Circuit and other Courts of Appeals have recognized the possibility of such a claim and noted that both Title VII and ADA-based claims are governed by the same standard. *See, e.g.*, *Rood v. Umatilla Cty.*, 526 F. Supp. 2d 1164, 1176 (D. Or. 2007); *see also Keever v. City of Middletown*, 145 F.3d 809, 813 (6th Cir. 1998). "An employer is liable . . . for conduct giving rise to a hostile environment where the employee proves (1) that he was subjected to verbal or physical conduct of a harassing nature, (2) that this conduct was unwelcome, and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the victim's employment and

create an abusive working environment." *Pavon v. Swift Trans. Co., Inc.*, 192 F.3d 902, 908 (9th Cir. 1999). Notably, the conduct at issue must be discriminatory—here, motivated by sex or disability-status based animus—rather than a violation of some "general civility code." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). In order to determine whether an environment is sufficiently hostile or abusive, courts are directed to "look[] at all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

As noted above, the majority of the conduct at issue in this case is untimely. Thus, the court will consider any untimely discrete acts that took place prior to October 23, 2012 only "as background evidence to support a timely claim." *Morgan*, 536 U.S. at 102. Since that date, Mulligan can only point to three incidents that might give rise to a hostile work environment claim: 1) a request for an ergonomic assessment that was made on October 23, 2012 (Dkt. 32-13), 2) a request for clerical assistance made on March 29, 2013 that was allegedly ignored (Compl. ¶ 63), and 3) an incident where Mulligan's supervisor referred to her as an "ungrateful fucking bitch" (Troope Depo. 116:23-117:3.)  The court finds that these incidents are insufficient to create a triable issue of fact as to hostile work environment. As both parties' acknowledge, the October 2012 request for an ergonomic assessment, where Mulligan asked for a new workstation, filing cabinets, and keyboard tray, was conducted by December 2012. (Ex. 4, attached to Pinchas Decl.; Mulligan Depo. 278:10-18.) Likewise, Mulligan acknowledges receiving additional clerical support in 2013 to help her with carrying and filing materials. (*Id.* 110:15-25; 113:24-114:4.) As for the profane remark, the totality of the circumstances counsels against a finding of hostile work environment. Indeed, it appears to be precisely the sort of "mere offensive utterance" that *Harris* suggested was not actionable. *See* 510 U.S. at 23. It was the only incident of its kind and the context of the utterance was regarding an interpersonal dispute about whether Mulligan would attend an after-work awards ceremony. The

comment does not appear to be related in any way to Mulligan's sex or stated disability. Mulligan does submit a declaration that she believes her supervisors "diatribe" was "due to prior Title VII EEO activity" but there is no evidence to corroborate this account and the deposition of the colleague who heard the comment makes no mention of EEO activity. Accordingly, to the extent that Mulligan alleges a hostile work environment claim separate from her retaliation claim, the court GRANTS Defendant summary judgment on that claim.

### C. Per Se Retaliation

Mulligan contends that the EEOC engaged in "per se retaliation" because her supervisor made derogatory remarks about Mulligan's prior EEO activity, as well any contemplated future EEO activity. Mulligan cites to a number of EEOC cases standing for the proposition that "comments that, on their face, discourage an employee from participating in the EEO process are evidence of per se retaliation." *See, e.g.*, *Matt A. v. Veterans Affairs*, EEOC Appeal No. 012016110 (August 17, 2016). Setting aside the fact that these decisions are not binding on federal courts, the only two other district courts to consider this theory of retaliation have concluded that it is not a cognizable claim in the Ninth Circuit. *See Cramblett v. McHugh*, 2014 WL 2093600 at * 14 (D. Ore. May 19, 2014) ("[T]here is no legal support for the proposition that any expression of skepticism by an employer of the merits of an employee's EEO Complaint constitutes retaliation."); *E.E.O.C. v. Go Daddy Software*, No. CV-04-2062-PHX-DGC, 2006 WL 1791295, at *7 (D. Ariz. June 27, 2006) ("In the absence of such controlling authority, and in light of the Ninth Circuit's refusal to establish a different per se rule in Title VII retaliation claims, *see Coszalter v. City of Salem*, 320 F.3d 968, 977–78 (9th Cir.2003), the Court declines Plaintiff's invitation to establish a per se rule in this specific context."). Accordingly, this Court declines to establish a claim for per se retaliation in this case and GRANTS Defendant summary judgment on Mulligan's Third and Fourth claim for relief for per se retaliation.

///

///

**D. Retaliation Claims**

Defendant contends that Mulligan has failed to plead a prima facie case for retaliation. In order to state a prima facie case for retaliation, a plaintiff must show that "(1) [s]he engaged in activity protected . . . , (2)[her] employer subjected [her] to an adverse employment action, and (3) the employer's action is causally linked to the protected activity." *Jurado v. Eleven–Fifty Corp.*, 813 F.2d 1406, 1411 (9th Cir. 1987). Defendant concedes that Mulligan has engaged in protected activity but contends that Mulligan's claim fails to satisfy the remaining two prongs. Mulligan raises three potentially adverse employment actions. The first are the 2012 and 2013 accommodation denials. Defendant responds that these requested accommodations were handled by the EEOC's disability program managers. (Ex. 11, attached to Pinchas Decl.) Thus, even if the delays in providing accommodation constituted adverse employment actions, there is insufficient evidence that the managers had any retaliatory motive or that any alleged retaliatory motive on the part of Mulligan's supervisor infected the decision making of the disability program managers. (Mot. 14.) Mulligan responds that the lengthy history of delays demonstrates a retaliatory motive and specifically notes that on several occasions Mulligan's supervisor did not promptly forward her accommodation requests to the appropriate department. (Opp'n 24.) These assertions fail to demonstrate the required nexus between any delay in providing accommodation and retaliatory motive. Even if some of Mulligan's accommodation requests were not promptly forwarded by Siegel, the requests at issue here were made directly with the disability program managers and the fact that there have been delays in the past does not demonstrate retaliatory motive on the part of the managers responding to the 2012 and 2013 requests.

The second adverse employment action Mulligan points to is the derogatory remark made by her supervisor to a fellow Administrative Judge that Mulligan was an "ungrateful fucking bitch." Mulligan correctly notes "that an action is cognizable as an adverse employment action if it is reasonably likely to deter employees from engaging in protected activity." *Ray v. Henderson*, 217 F.3d 1234, 1243 (9th Cir. 2000). However,

1   Mulligan has failed to present sufficient evidence to create a triable issue of fact that the

2   actionable comments at issue here are reasonably likely to deter employees from

3   engaging in protected activity. To the contrary, the Ninth Circuit has on numerous

4   occasions affirmed grants of summary judgment where the adverse action complained of

5   was a limited number of hostile comments.  *See Hardage v. CBS Broadcasting, Inc.*, 427 F.3d

6   1177, 1189 (9th Cir. 2005), amended on other grounds 438 F.3d 672 (9th Cir. 2006)

7   (collecting cases).

8        Finally, Mulligan contends that the EEOC failed to promote her to the GS-15 level

9   in retaliation for engaging in protected activity. (*See* Compl. ¶ 87.) Specifically, Mulligan

10   contends that the EEOC Human Resource Specialist Immanuel West delayed Mulligan's

11   reclassification attempt and that the EEOC would not offer a fair adjudication of

12   reclassification request because the new supervisor of Mulligan's unit was being

13   pressured to provide inaccurate information regarding Mulligan's Position Description.

14   (Opp'n 21-22.) Here, too, Mulligan fails to create a triable issue of fact as to retaliation.

15   Mulligan has not provided evidence that any delay on the part of EEOC's human

16   resources staff was causally linked to Mulligan's protected activity. Moreover, instead of

17   allowing the EEOC adjudication process to run its course, Mulligan moved the claim into

18   this action because she determined that her supervisors were being pressured to not

19   support her request. (*Id.*) However, Mulligan's own deposition testimony reveals that her

20   supervisors did ultimately provide accurate certifications in connection with her

21   reclassification effort. (Mulligan Depo. 283:2-7.) Thus, there is no evidence that Mulligan

22   was retaliated against for engaging in protected activity during her efforts to secure a pay

23   raise.

24

25   ///

26   ///

27   ///

28   ///

1   **IV. CONCLUSION**

2        For the reasons stated above, the court GRANTS Defendant's Motion for

3   Summary Judgment.

4
5   **IT IS SO ORDERED.**

6

7

8   Dated: November 2, 2016        _____

9                                      DEAN D. PREGERSON
10                                 UNITED STATES DISTRICT JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28